Filed 5/13/21  P. v. Libich CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B298370 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. SA095699 |
| v. | |
| MARTIN LIBICH, | **Order Denying Petition for Rehearing and Modifying Opinion** |
| Defendant and Appellant. | |
| | [No change in judgment] |

BY THE COURT:*

It is ordered that the petition for rehearing filed May 7, 2021, is denied and the opinion filed April 22, 2021 is modified as set forth below. There is no change in the judgment.

On page 21, add the following footnote (new footnote 10) at the end of the last sentence: "After we issued the opinion in this matter, the Attorney General sought rehearing, arguing for the first time that the two-year limit for felony probation terms does not apply to cases involving domestic violence. The People have forfeited that argument by failing to raise it in their March 19,

2021 supplemental letter brief. Therefore, we express no opinion on that subject. Nevertheless, nothing in our opinion should be construed to foreclose the prosecution from making that argument upon remand, and the trial court may consider the argument when it decides whether to reduce defendant's probation term under A.B. 1950."

---

*EDMON, P. J.    LAVIN, J.    EGERTON, J.

Filed 4/22/21 P. v. Libich CA2/3 (unmodified opinion)
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MARTIN LIBICH,<br><br>  Defendant and Appellant. | B298370<br><br>Los Angeles County<br>Super. Ct. No. SA095699 |

APPEAL from a probation order of the Superior Court of Los Angeles County, Upinder Kalra, Judge. Affirmed in part and remanded with directions.

David R. Greifinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Martin Libich was convicted of aiding and abetting his then-girlfriend's stalking and electronic harassment of Leandra Y., his ex-girlfriend, and electronic harassment of Lux Y., his child with Leandra. On appeal, he argues we must reverse the stalking conviction because one of the aiding-and-abetting instructions misidentified the victim as Lux rather than Leandra. Although we agree the instruction was confusing, we conclude that the prosecutor's closing argument resolved the ambiguity and that it is not reasonably likely the jury misunderstood the relevant legal principles. Defendant also argues—and the People concede—that Assembly Bill No. 1950 (2019–2020 Reg. Sess.) (A.B. 1950), which reduced maximum felony probation terms to two years, applies to him retroactively because it became effective while his appeal was pending. Defendant asks us to reduce the term of his probation on appeal whereas the People urge us to remand. We conclude that under the circumstances of this case, remand is the proper remedy. We therefore vacate the probation order and remand with directions to reconsider it under A.B. 1950.

## PROCEDURAL BACKGROUND

By information dated May 18, 2018, defendant was charged with one count of stalking (Pen. Code,[1] § 646.9, subd. (a); count 1) and two counts of electronic harassment (§ 653.2, subd. (a); counts 3 & 4).[2] The information named Leandra as the victim of

---

[1] All undesignated statutory references are to the Penal Code.

[2] Count 2, felony vandalism, was dismissed.

counts 1 and 3 and named Lux as the victim of count 4. Defendant pled not guilty.[3] After a jury trial at which he did not testify, defendant was convicted as charged.

The court suspended imposition of sentence for count 1 and placed defendant on five years' formal probation. Among other probationary terms, defendant was required to serve 270 days in county jail, perform 30 days of community service, and complete a 52-week domestic violence treatment program followed by psychological counseling for the remainder of the probation period. For counts 3 and 4, imposition of sentence was suspended and defendant was placed on three years' summary probation, to run concurrently with probation for count 1.

Defendant filed a timely notice of appeal, and we affirmed by unpublished opinion. (*People v. Libich* (Nov. 17, 2020, B298370) [nonpub. opn.].) Defendant then petitioned the California Supreme Court for review. The court granted the petition and transferred the matter to us with directions to vacate our prior opinion and reconsider the matter in light of A.B. 1950.

## FACTUAL BACKGROUND

### 1.    Defendant's relationship with Leandra

Leandra and defendant met online in 2009. About a month later, Leandra got pregnant with Lux, who was born the following year. By the time Leandra discovered she was pregnant, the relationship had ended. Nevertheless, Leandra told

---

[3] On December 5, 2018, the case was dismissed under section 1387.2. By stipulation, defendant was re-arraigned and the case proceeded with the existing accusatory pleading.

defendant about the pregnancy, and they discussed co-parenting the child.

During these discussions, defendant became controlling, so Leandra limited their communication to email and text messages. When Lux was born, Leandra and defendant again tried to communicate and to co-parent—but those attempts also failed. Ultimately, several months after Lux's birth, a paternity suit was filed to establish custodial time.

Years of contentious litigation over custody and child support followed: Leandra and defendant appeared in court more than 25 times over the next six years. In 2011 or 2012, the court ordered defendant and Leandra to communicate via Family Wizard, an online service that maintains records for parents in conflict. This was the only way the couple communicated—except in emergencies, for which texting was allowed.

As relevant here, Leandra and defendant were scheduled to appear for a custody hearing on July 18, 2016. Defendant had moved for more custodial time; Leandra was opposed.

## 2. Defendant convinces his new girlfriend to harass Leandra

Defendant met Christina Ceglar online in late May 2016, on Collarspace, a website catering to the BDSM[4] community.[5] Collarspace also has a section for people seeking dominant–submissive relationships. A dominant–submissive (DS) relationship is a consensual relationship in which the dominant

---

[4] BDSM stands for bondage, discipline, sadism, and masochism.

[5] Ceglar testified as part of an agreement in which she pled no contest to felony stalking with an anticipated disposition of five years' felony probation. She was scheduled to be sentenced after she testified.

partner has all the control, makes the decisions, and gives orders; the submissive partner follows those orders and does everything to please the dominant partner. Defendant and Ceglar became "heavily" involved in such a relationship.

Ceglar's Collarspace profile described her as a "submissive seeking a dominant, wanting a permanent master, looking for someone who could provide me with structure and guidance[.]" Defendant's profile, which he posted under the screen name Jean Clawed, described him as a "dominant seeking a submissive to please" him.

Defendant contacted Ceglar through Collarspace, and she agreed to meet him at a café in El Segundo. The relationship grew intense quickly. Their DS relationship began soon after meeting, and they became sexually involved. Eventually, they started texting by phone instead of messaging through Collarspace; defendant had at least two phone numbers.

Defendant took Ceglar to Chicago from June 7–10, 2016. When they returned, defendant assumed an active role as the dominant partner in the relationship. He planned entire days for Ceglar. He provided her with phone apps to keep up with her activities—including scheduling apps that would document everything she did throughout the day so defendant could monitor her "progress." One app allowed him to reserve blocks of time for certain activities; another let him create task checklists. Defendant assigned tasks to Ceglar: reading a book and writing about it, brushing her teeth, watching television for an hour, taking a break. And he told her when to do those tasks—when to clean the house, make lunch, do dishes, read, wash her face, brush her teeth, exercise, and go to bed. He was in control "from the moment" she woke up until the "moment [she] went to bed."

5

Ceglar did what defendant wanted because she wanted to please him—because pleasing him pleased her.

On the Chicago trip, defendant told Ceglar about Leandra and Lux. He said he was battling Leandra for custody; Leandra was a "terrible person," and he needed to do "anything in his power" to get his daughter away from her. Ceglar could help him do it.

Defendant asked Ceglar to create a fake Collarspace profile for Leandra. His plan was to get so many Collarspace users to call her that Leandra would have to change her phone number. Forcing Leandra to change her number "would cause big problems in her life" because the number was connected to her business. Defendant and Leandra were scheduled to appear in court for a custody hearing at 7:00 a.m. on Monday, July 18, 2016—and defendant wanted Leandra to change her phone number before that hearing. Ceglar—who was in a bipolar manic state at the time—agreed. She believed what defendant told her about Leandra and was willing to do anything to please him.

Defendant gave Ceglar Leandra's phone number, both verbally and by text message. He sent the text from his alternate phone on Friday, July 15, 2016, at 11:22 a.m. Defendant told Ceglar that Leandra lived in a little yellow house and that his daughter's nickname was Little Ms. Lux. Together, defendant and Ceglar came up with a profile name—Alexandra Lux—and decided on the language for the post.

In mid-July 2016, Ceglar posted the profile on Collarspace. It read:

> Hello. My name is Alexandra Kay[6] and my little girl's name is Lux. [¶] … [¶] We are not new to the site, but this is a new profile. I just got a new phone number specifically for this purpose. I like to be scared. It's a thrill. If you can manage to scare me, I will be very impressed, and you will prove yourself worthy of my attention. Tears turn me on. I live in a little yellow house in Venice Beach, California. [¶] … [¶] Protecting my little girl is what's most important to me. This phone number is specifically for this part of my life. I like to pretend. Can you beat me at my own game? All I want is your phone calls and your best. My new phone number is [redacted]. You can ask for myself, Leandra, or my baby girl, Lux. Good luck, xoxo. Please forgive us if we do not get back to your messages right away.

The post was signed "Mommy Dearest, xoxo, Little Ms. Lux." In an effort to attract more callers, Ceglar included a photo of a woman licking another woman's foot. Ceglar told defendant that the profile was live.

A Collarspace journal entry posted on Friday, July 15, 2016, at 10:53 p.m. said: "I am accepting calls from private numbers only, but only for the next nine minutes, K. Turning off my phone at 11:00 p.m. ☺ [phone number]. Press *67 before dialing or block your number, K. Leandra Kay."

---

[6] Kay is Leandra's middle name.

In a separate Collarspace profile, Ceglar posted a photo of injured buttocks next to text that read: "I need to feel safe and secure. [Phone number.] What do you have to lose, loser? … My farts are eggy. They smell like eggs." A third profile, which Ceglar called "$2 Whore 4 U," also included Leandra's phone number.

At defendant's direction, Ceglar also made at least 60 harassing calls to Leandra herself and left 20 or 30 voicemail messages. The first message, from July 15, 2016, at 2:11 p.m., was, "Leandra Kay, I love you."

Many of the messages left that weekend insulted and threatened Leandra and told her to change her number. Ceglar testified that the voicemails sounded desperate, enraged, out of control, and angry. She was trying to scare Leandra, to throw her off in the custody hearing, and to get her to change her phone number.

Other messages expressed resentment: "Hey, this is a job for me. I feel like I'm at fucking work." And: "I'm not the responsible person here. That's the only person who can tell me to stop. That is the only person that I care about right now." Defendant was the responsible person, and the task he had assigned her to complete was the work.

Meanwhile, Ceglar had also written Leandra's telephone number in a bathroom stall at an Alcoholics Anonymous club and on a curb next to a liquor store. She also hit two cars in a Whole Foods parking lot and left notes on them with Leandra's phone number.

On July 19, 2016, Ceglar left Leandra a final message: "I apologize to you. I'm very sorry for everything that I did. … I was wrong. … Just leave me alone. I'm very sick. I'm getting help.

You were right … about him … and I'm very sorry. Goodbye." (Ellipses in original.) Defendant once told Ceglar that Leandra thought he was a monster; Ceglar wanted Leandra to know that she was right. Soon thereafter, Ceglar checked herself in to a hospital psychiatric ward.

Ceglar's claim that defendant had asked her to harass Leandra was corroborated by Ceglar's contemporaneous statements to an ex-boyfriend with whom she was living at the time.

### 3. Leandra receives harassing phone calls the weekend of July 15, 2016–July 17, 2016

On Friday, July 15, 2016, Leandra began receiving threatening phone calls and messages on her mobile phone. The first message, from a female caller, was a voicemail that said, "Leandra Kay, I love you." Kay is Leandra's middle name; only her mother and defendant had ever called her Leandra Kay.

Later that day, Leandra began receiving phone calls and text messages asking for "Alexandra Lux," "Lux the Whore," and "Lux the Slut," Leandra received between 50 and 100 calls in all, most of which used profanity and asked for Lux by name. At the time, Lux was six years old. The calls made Leandra fear for her daughter's safety.

Leandra asked the callers where they got her number—and some told her it had been posted on Collarspace. Leandra wasn't familiar with the website, so she went online and searched it for Alexandra Lux. She found a profile that included her phone number, her daughter's name, and a description of her house. She also noted that the profile read "Mommy Dearest xoxo and Little Ms. Lux." Defendant had a history of referring to her and Lux, respectively, as Mommy Dearest and Little Ms. Lux.

9

On Saturday, July 16, 2016, Leandra received a call from a woman who said she had found Leandra's phone number written on a wall at a community treatment center. Next to the number was a message that said "selfish or helpless." Leandra had never been to the treatment center. Later that day, Leandra reported the calls to the police. She told police she believed defendant was behind them.

Throughout the weekend, Leandra received phone calls, text messages, and voicemails threatening her daughter. The voicemails—left by a female caller—insisted that Leandra be a good mother, protect her daughter, and change her number. The messages continued late Saturday night and into Sunday morning. At one point on Sunday morning, Leandra was receiving calls every four to eight minutes.

On Sunday, July 17, 2016, Leandra was contacted by a man who said he'd found a note on his car with Leandra's name and number; the note said Leandra needed help. The man said his car had been parked outside a Whole Foods. As Leandra made her way there, she was contacted by a police detective about a possible hit and run in the Whole Foods parking lot. Leandra had not been to the parking lot that day, had not hit anyone, and had not left a note. When Leandra arrived at the scene, she encountered a police officer. The officer didn't see any damage on her car.

4.    **The Defense Case**

The defense argued that Ceglar had acted alone and introduced evidence that she had engaged in similar behavior before.

In May 2016, before meeting defendant, Ceglar posted a Collarspace journal entry in which she wrote: "I posted some

bitch's number who I was harassing. She have [*sic*] me the $300 today. I'll take it down."

A month later, Ceglar was upset that a friend she'd met in church had not promptly returned a $5 hairbrush Ceglar had left in the friend's car. So, in June and July 2016—about two weeks before creating the Alexandra Lux profile—she posted the friend's personal mobile phone number on Collarspace. Ceglar created a profile under the name Ice Queen Snow with a picture of the friend, the friend's phone number, and a message: "Please help me come tonight. My name is Snow. It will go straight to voicemail. Make it good. Be creative. No limits." In a journal entry under the same profile, Ceglar called the friend a cunt.

The defense also introduced a series of lengthy email messages Ceglar sent to a different friend on July 9, 2016—before she posted the Alexandra Lux profile—in which she complained that defendant was leaving her. Ceglar and defendant had broken up two days earlier, and Ceglar laid out a detailed plan to gather intelligence and hurt defendant.[7] She wrote: "I know where he lives. I can stalk him. I can find out where he drops his daughter after school. I can find out who the mother is. I can post things publicly, anything to get her attention to me, which I'm sure would be much easier than getting his. I can make him talk, lies or the truth. I can make him answer. I need to be calculated." The next day, July 10, 2016, Ceglar texted her friend, "I fucking hate him" and "I hope something horrible happens to him." She

---

[7] The timing of the breakup was corroborated by numerous instances of Ceglar referring to the breakup and to being single on July 7, 10, 12, and 15, 2016, as well as evidence that she began seeing another man on July 12, 2016, and developed a relationship with a man from Arizona on July 18, 2016.

also sent the friend a text containing Leandra's first name, last name, and home address.

Indeed, Ceglar explained that she'd made similar threats to an ex-boyfriend. After finding the names of all of his family members, his 13-year-old nephew, his friends, and his ex-girlfriend, she told him: "If you tell your business associates about me and your concerns, I will post the first video on the world wide web. Sure, I can get in a lot of trouble. Sure, I would have consequences for that, but I think your consequences are far worse."

## DISCUSSION

Defendant argues we must reverse count 1 because CALCRIM No. 402—aiding and abetting under the natural-and-probable-consequences doctrine—misidentified the victim of the non-target offense. We conclude that the prosecutor's closing argument resolved the instruction's ambiguity such that it is not reasonably likely the jury misunderstood the relevant legal principles.

### 1. Legal Principles and Proceedings Below

"A court is required to instruct the jury on the points of law applicable to the case, and no particular form is required as long as the instructions are complete and correctly state the law. [Citation.] In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) We review the wording of jury instructions de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

"If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. [Citations.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 963.) In making this determination, we consider the challenged language " 'in the context of the instructions as a whole and the trial record' … ." (*People v. Reliford* (2003) 29 Cal.4th 1007, 1013.) In particular, we "must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. [Citations]." (*People v. Young* (2005) 34 Cal.4th 1149, 1202 (*Young*).)[8]

A defendant can be guilty of a crime he does not personally commit if he aids and abets the actual perpetrator—and he may be guilty as an aider and abettor in two ways. A defendant acts as a direct aider and abettor if he, "(i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164; § 31.) In addition to being liable for crimes he intends to aid and abet (target crimes), a defendant may be convicted of any crime that was the natural

---

[8] Citing *People v. Mendoza* (1974) 37 Cal.App.3d 717, defendant insists that although "instructions must be read in context, courts must presume that the jury accepted their plain meaning." *Mendoza*, an opinion from an intermediate appellate court, predates the California Supreme Court opinions cited above. It also predates *Estelle v. McGuire* (1991) 502 U.S. 62, 72, on which those opinions are based. As such, to the extent *Mendoza* announces a different standard than these later cases, it is no longer good law. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

and probable consequence of a target crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 261–262.)

Here, the court instructed the jury on both direct aiding and abetting (CALCRIM No. 401), and aiding and abetting under the natural-and-probable-consequences doctrine. Defendant contends the instruction on this second theory of aiding and abetting misidentified the victim of the non-target crime of stalking (§ 646.9, subd. (a); count 1) as Lux rather than Leandra.

The court instructed the jury as follows:

> A separate theory of aiding and abetting is known as the Natural and Probable Consequences Doctrine. Under this theory, under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.

> The defendant is charged in Counts 3 and 4 with violating Penal Code section 653.2(a) (Electronic Harassment) and in Count 1 with violating Penal Code section 646.9(a) (Stalking).

> Under this theory of aiding and abetting, you must first decide whether the defendant is guilty of Count 3, a violation of Penal Code section 653.2(a), against Leandra Y. If you find the defendant is guilty of this crime, you must then decide whether he is guilty of Penal Code section 646.9(a), as charged in Count 1, and Penal Code section 653.2(a), as charged in Count 4 against Lux Y.

> Under this theory, to prove that the defendant is guilty of Penal Code section 646.9(a), as charged in Count 1, and Penal Code section 653.2(a), as charged

14

in Count 4 against Lux Y., the People must prove that:

1. The defendant is guilty of Penal Code section 653.2(a) against Leandra Y. as charged in Count 3;

2. During the commission of Penal Code section 653.2(a) a coparticipant in that Penal Code section 653.2(a) committed the crime of **Penal Code section 646.9(a) or 653.2(a) against Lux Y.**;

3. Under all the circumstances, a reasonable person in the defendant's position would have known that the commission of **Penal Code section 646.9(a) or 653.2(a) against Lux Y.** was a natural and probable consequence of the commission of the Penal Code section 653.2(a) against Leandra Y.

A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

Each of the counts charged in this case is a separate crime. You must consider the natural and probable consequence theory separately for Count 1 and Count 4.

To decide whether the crime of Penal Code section 646.9(a) (Stalking) or Penal Code section 653.2(a) (Electronic Harassment) were committed, please refer to the separate instructions that I will give you on that crime.

(Bold added; see CALCRIM No. 402.)

## 2. The instruction was ambiguous, but there is no reasonable likelihood the jury misunderstood it.

As discussed, when introducing the elements of aiding and abetting under the natural-and-probable-consequences doctrine, the court instructed: "Under this theory, to prove that the defendant is guilty of Penal Code section 646.9(a), as charged in Count 1, and Penal Code section 653.2(a), as charged in Count 4 against Lux Y., the People must prove … ." (Emphasis added.) This sentence contains two nonrestrictive phrases, each set off by a pair of commas. The second phrase, "as charged in Count 4 against Lux Y.," makes clear that Lux Y. is the victim of count 4. By contrast, the first phrase, "as charged in Count 1," does not identify the victim of count 1.

The instruction then explains the elements of aiding and abetting under a natural-and-probable-consequences theory. Specifically, the second element required the prosecution to prove that during the commission of count 3, a co-participant "committed the crime of Penal Code section 646.9(a) or 653.2(a) against Lux Y." And, to prove the third element, the prosecution had to establish that a reasonable person in defendant's position would have known that "the commission of Penal Code section 646.9(a) or 653.2(a) against Lux Y. was a natural and probable consequence of the commission of [count 3] against Leandra Y."

16

On its face, then, the instruction tells the jury that both count 1 and count 4 concern Lux Y. And, because the nonrestrictive phrase modifying count 1 in the previous paragraph does not rule out the possibility that Lux was the victim of count 1, the instruction appears to misidentify the victim. Furthermore, contrary to the People's repeated assertions, no other instruction identifies Leandra as the victim of count 1. And, unlike the verdict forms for counts 3 and 4, the verdict form for count 1 also fails to identify a victim. Accordingly, because nothing in the other jury instructions contradicts the apparent meaning of the language in CALCRIM No. 402, viewed either in isolation or in the context of the charge as a whole, the instruction was ambiguous.

In light of this ambiguity, we must determine whether it is reasonably likely that the jury understood the instruction in a way that violated defendant's constitutional rights. (*Estelle v. McGuire*, *supra*, 502 U.S. at p. 72.) That is, could one or more jurors have understood the non-target offense to be stalking Lux rather than Leandra? Based on the record as a whole—and counsel's arguments in particular—we conclude that interpretation is not reasonably likely. (See *People v. Reliford*, *supra*, 29 Cal.4th at p. 1013 [court must consider trial record]; *Young*, *supra*, 34 Cal.4th at p. 1202 [court must consider counsel's arguments].)

During closing argument, the prosecutor explained aiding and abetting under a natural-and-probable-consequences theory this way: First, the prosecution had to prove "that the defendant is guilty of electronic harassment of Leandra Y. as an aider and abettor. During the commission of that harassment of Leandra Y., Ceglar stalked Leandra Y. … and harassed Lux,

17

and … that was a natural and probable consequence of harassing Leandra." Later, the prosecutor again referred to Leandra as the victim of stalking: "So under either theory, I think the evidence proves that [defendant] intended Ceglar to harass and stalk Leandra." Then, the prosecutor explained the elements of stalking: "Ceglar willfully and maliciously harassed Leandra Y. No doubt that happened. She made a credible threat with intent to place Leandra Y. in reasonable fear for her safety or the safety of a family member—in this case, Lux. No doubt that happened." Finally, at the end of his argument, the prosecutor explained that defendant used Ceglar "to stalk and harass his ex and in the process harassed his own daughter." Taken as a whole, the prosecutor's argument cleared up the ambiguity in the instruction.

We also note that the "record contains no inquiries from the jury regarding the application of these instructions." (*Young*, *supra*, 34 Cal.4th at p. 1203.) Indeed, there is no indication the jury struggled with its verdict at all: Deliberations only lasted for about an hour.

Because it is not reasonably likely the jury misunderstood the victim of count 1 to be Lux rather than Leandra, we conclude the court did not err.

### 3.    A.B. 1950

When probation was granted in this matter, section 1203.1, subdivision (a), provided that a court may impose felony probation "for a period of time not exceeding the maximum possible term of the sentence." It further provided that "where the maximum possible term of the sentence is five years or less, then the period of suspension of imposition or execution of

18

sentence may, in the discretion of the court, continue for not over five years." (Former § 1203.1, subd. (a).)

While this appeal was pending, the Legislature passed, and the Governor signed, A.B. 1950, which amended section 1203.1. (Stats. 2020, ch. 328, § 2.) Subject to exceptions not applicable here, section 1203.1, subdivision (a), as amended, provides that a felony probation term cannot exceed two years. Similarly, section 1203a, as amended, limits probations terms for most misdemeanors to one year. (Stats. 2020, ch. 328, § 1.)

Defendant contends A.B. 1950's two-year limitation for felony probation terms applies retroactively to cases like his that were not final when the new law became effective on January 1, 2021. (See *People v. Sims* (2021) 59 Cal.App.5th 943, 955–964 (*Sims*); *People v. Quinn* (2021) 59 Cal.App.5th 874, 879–885 (*Quinn*).) The People agree, and we accept their concession.[9] Because defendant's case was pending on direct appeal and, therefore, was not final as of A.B. 1950's effective date, A.B. 1950 applies retroactively to him.

Although the parties agree on retroactivity, they disagree about the proper remedy. Defendant, following *Quinn*, asks us to modify the probation order to reduce his term of supervision to two years. (*Quinn, supra*, 59 Cal.App.5th at p. 885.) The People, by contrast, ask us to follow *Sims* and remand for the trial court to modify the probation order. (*Sims, supra*, 59 Cal.App.5th at p. 964.) The parties are right that those cases had different dispositions—but neither court explained why it disposed of its case the way it did.

---

[9] As such, we do not reach the merits of the issue.

19

The People urge that "[r]emand permits the trial court to adjust, modify, or strike probation terms, so that they can be complied with before termination of probation or removed from consideration of whether the probation terminated successfully. The trial court can [also] determine the date probation terminated or will terminate under the new law, and whether conditions remained unmet." Defendant neither responds to these arguments nor explains why he believes modifying the order on appeal is the better approach.

Under the circumstances of this case, we agree with the People that remand is appropriate. Here, the court imposed a substantial number of probation conditions. Among other probationary terms, defendant was required to serve 270 days in county jail, perform 30 days of community service, complete a 52-week domestic violence treatment program followed by psychological counseling, and refrain from participating in any dominant–submissive social media. The court also ordered defendant to submit to electronic search of his devices and abide by a 10-year protective order. The appellate record does not reveal how defendant has fared in completing these requirements. As such, we vacate the probation order and remand so that defendant may seek a reduced probation term under A.B. 1950. (*Sims*, *supra*, 59 Cal.App.5th at p. 964; § 1203.3, subd. (a); see *People v. Killion* (2018) 24 Cal.App.5th 337, 340 ["Generally, a trial court has the authority and discretion to modify a probation term during the probationary period, including the power to terminate probation early."].)

## DISPOSITION

The probation order is vacated and the matter is remanded with directions to issue a new order consistent with the views expressed in this opinion. In all other respects, we affirm.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.